UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
COUNTY OF ROCKLAND, EDWIN J. DAY, in his official
capacity as County Executive, and the LEGISLATURE OF
THE COUNTY OF ROCKLAND,

                       *Plaintiffs*,

**Docket No. 24-cv-2285**

    -against-

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY and
METROPOLITAN TRANSPORTATION AUTHORITY,

                       *Defendants*.
-------------------------------------------------------------------------------x


# MEMORANDUM OF LAW
# IN SUPPORT OF PLAINTIFFS' MOTION
# FOR PRELIMINARY INJUNCTION

# PRELIMINARY STATEMENT

Plaintiffs the County of Rockland, Rockland County Executive Edwin Day, and the Rockland County Legislature (together, "Plaintiffs" or "Rockland") respectfully submit this memorandum of law in support of their motion for a preliminary injunction.

On January 5, 2025, defendants the Triborough Bridge and Tunnel Authority ("TBTA") and the Metropolitan Transportation Authority ("MTA") (together, "Defendants") intend to implement the New York Central Business District Tolling Program, commonly known as "Congestion Pricing." This program will, *inter alia*, impose a $9 charge on all drivers entering Manhattan below 60th Street, which is scheduled to increase to $15 in just a few years.

As set forth in Plaintiffs' underlying complaint, Congestion Pricing will have a disparate impact on Rockland County residents, many of whom already pay the highest amount of any commuters into Manhattan ($17.63 for a typical passenger car at the George Washington Bridge without E-Z Pass).[1] This disparity will be exacerbated by the fact that Congestion Pricing credits are being offered to drivers entering lower Manhattan via one of the four tunnels, but ***not*** to users of the Hudson River bridges, many of whom commute from Rockland.

The charges that Congestion Pricing imposes, which are intended to reduce traffic and pollution, are not linked to the time spent, distance traveled, or type of vehicle used within the Congestion Pricing zone, meaning that the program cannot even clear the low bar of rational basis review for purposes of Plaintiffs' Equal Protection claim. Plaintiffs are also likely to succeed on the merits of their other claims because, *inter alia*, the Congestion Pricing "toll" is actually a tax which Defendants have no authority to implement, and because it constitutes an excessive fine in violation of the Eighth Amendment.

---

[1] https://www.panynj.gov/bridges-tunnels/en/tolls/2024-tolls.html.

Regarding irreparable harm, the harm to Plaintiffs is neither remote nor speculative; absent a preliminary injunction, Congestion Pricing will take effect in less than a month. Based on the sheer number of commuters (many of whom will be "tolled-by-mail") who will pay Congestion Pricing from Day 1, it would not be feasible to fully redress this if Plaintiffs ultimately prevail.

As for the balance of equities, this lawsuit—which requires little or no discovery—can be adjudicated relatively quickly.[2] Defendants would not be seriously impacted by an injunction in the interim, as evidenced by the Governor's recent six-month "pause" of Congestion Pricing implementation. In contrast, the impact upon Plaintiffs of recklessly plowing forward with Congestion Pricing without mitigating options such as credits for the Hudson River bridges will be severe. Accordingly, and for the additional reasons set forth below, the Court should preliminarily enjoin Defendants' Congestion Pricing program.

## RELEVANT BACKGROUND

The full factual background of this case is set forth in the underlying Amended Complaint, ECF Dkt. No. 9 ("Am. Compl."); the pleadings in the related case filed by Orange County (24-cv-3983); and the pleadings in four other cases pending in this district (23-cv-10365, 24-cv-0367, 24-cv-1644 and 24-cv-4111), which similarly challenge Congestion Pricing and which have been consolidated before the Hon. Lewis J. Liman.[3] The facts are largely undisputed.

Defendants' Congestion Pricing program, set to take effect on January 5, 2025, will automatically charge drivers who enter Manhattan's Central Business District ("CBD"), which starts below 60th Street but generally excludes the West Side Highway and the FDR Drive. (Am.

---

[2] Indeed, a potentially preclusive decision on cross-motions for summary judgment has been fully briefed and argued before a New Jersey district court; a final decision is pending. *See generally State of New Jersey v. United States Dep't of Transp. et al.*, No. 23-cv-3885 (D.N.J.) (Hon. Leo M. Gordon).

[3] A motion for a preliminary injunction is currently pending before Judge Liman.

Compl. ¶¶ 19-20.) Drivers will only be charged once per day, but they are charged the full amount regardless of how long they spend or how far they drive in the CBD. (*Id.* at ¶ 22.) Drivers are not charged for trips made wholly within the CBD. In other words, if a vehicle is garaged in the CBD and doesn't leave, it will ***never*** be charged, regardless of how much it contributes to traffic congestion and pollution on the streets of lower Manhattan. (*Id.* at ¶ 23.)

Per the MTA, 80% of the revenue generated by Congestion Pricing will go to modernizing NYC subways and buses; 10% will go to the Long Island Rail Road; and 10% will go to Metro-North Rail Road.[4] Neither the LIRR nor these subways and buses serve Rockland County. Portions of the Port Jervis and Pascack Valley commuter rail lines do serve Rockland, but neither connects Rockland to any part of New York City, let alone Manhattan's CBD.[5] Moreover, both lines are operated by NJ Transit Rail Operations, not Metro-North, and both have extremely limited service to Rockland. For example, there are only six evening rush-hour outbound trains on the Port Jervis line, after which the trains only run once every two hours.[6]

Rockland is part of the Metropolitan Commuter Mobility Tax "(MCMT") Region, in which employers and self-employed persons are heavily taxed to contribute to mass transit. (Am. Compl. ¶ 39.) But unlike other suburban counties in the Region such as Westchester, Nassau, and Suffolk, there is no "one-seat" train ride connecting Rockland to Manhattan, and the MTA provides no MCMT tax relief to Rockland. (*Id.* at ¶¶ 40–41.) The result is a $44 million/year tax deficit to Rockland—soon to be exacerbated by Congestion Pricing, which, as noted, provides little (if any) benefit to Rockland commuters. (*Id.* at ¶¶ 42–43.)

---

[4] *See* https://new.mta.info/tolls/congestion-relief-zone/better-transit.

[5] *See* https://new.mta.info/map/5351.

[6] *See* https://new.mta.info/document/126111.

Plaintiffs filed this action in March 2024 and amended their complaint on May 13, 2024. (ECF No. 9.) On June 5, 2024, with Defendants' answer still pending, Governor Kathy Hochul "directed the MTA to indefinitely pause congestion pricing to avoid added burdens to working- and middle-class families."[7] On September 30, 2024, while this pause was still in effect, Defendants requested leave to file a motion to dismiss. (ECF No. 24.) The Court directed any further pleadings amendments to be filed "30 days after announcement of a decision to end the pause," with any motion to dismiss due "30 days from amendment deadline." (ECF No. 29.)

Nine days after Election Day, on November 14, 2024, Governor Hochul announced a decision to end the pause on January 5, 2025. As reported by various news agencies, Congestion Pricing will now charge drivers a base amount of $9, increasing to $15 in three years.[8] Drivers entering the CBD through the four Manhattan tunnels (Lincoln, Holland, Queens-Midtown and Brooklyn-Battery) will receive a $3 "crossing credit,"[9] but no such credit is being offered for drivers—including many from Rockland—who cross the Hudson River bridges. Moreover, while New York State will be instituting a tax credit for residents of Manhattan's CBD whose adjusted gross income is less than $60,000 per year,[10] no such tax credit is being offered to Rockland residents (or anyone else living outside the CBD).

This motion will be fully briefed by December 16, 2024. (*See* ECF No. 37.)

---

[7] *See* New York State, "What They Are Saying" (June 5, 2024), *available at*: https://www.governor.ny.gov/news/what-they-are-saying-governor-hochul-announces-pause-congestion-pricing-address-rising-cost.

[8] ABC News, "New York to Launch Congestion Pricing with Lower Toll for Driving in Manhattan" (Nov. 14, 2024), *available at*: https://abc7ny.com/post/congestion-pricing-nyc-new-york-governor-kathy-hochul-expected-unpause/15544827/.

[9] *See id.*; *see also* https://new.mta.info/document/131571.

[10] Metropolitan Transportation Authority, "Your Questions About the Toll, Answered," *available at*: https://congestionreliefzone.mta.info/faqs.

## LEGAL STANDARDS

"The typical preliminary injunction … seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). A plaintiff seeking such an injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023).

> The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction. This requirement must therefore be satisfied before the other requirements for an injunction can be considered. To make this showing, the moving party must demonstrate that absent a preliminary injunction it will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (citations, internal brackets and quotation marks omitted). In lieu of likelihood of success on the merits, a plaintiff may also carry its burden by demonstrating "serious questions on the merits." *Id.* at 82. "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* at 82-83 (citations omitted).

Finally, a court considering a preliminary injunction must also "balance the competing claims of injury and [] consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction," *Yang v. Kosinski*, 960 F.3d 119, 135–36 (2d Cir. 2020), which factors may be considered together. *See id.*

# ARGUMENT

As an initial matter, this motion seeks a prohibitory injunction, as opposed to a mandatory injunction that would alter the status quo "by commanding some positive act." *Tom Doherty Assocs., Inc.*, 60 F.3d at 34. The distinction is critical, because the Second Circuit requires a "heightened standard" for the latter. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023). Such a "heightened standard" does not apply where, as here, the movant seeks only to maintain the status quo during the pendency of the action.

## I. Without a preliminary injunction, Plaintiffs will suffer irreparable harm.

The "irreparable harm requirement," as noted, "is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto. Ins. Co.*, 120 F.4th at 80. It requires a showing that the movant faces "actual and imminent" harm, which "cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

That the Congestion Pricing program is "actual and imminent" is evident now that Governor Hochul has lifted the pause of the program. Absent judicial action, Congestion Pricing will take effect on January 5, 2025—less than a month from the date of this motion—according to Defendants' own informational website.[11]

Nor can it seriously be disputed that Congestion Pricing will constitute harm "that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*; *see also Tripathy v. McCloskey*, No. 21-cv-6584 (CS), 2021 WL 5771129, at *10 (S.D.N.Y. Dec. 6, 2021). Per the MTA itself, "more than 700,000 vehicles enter the Manhattan CBD every weekday."[12] If

---

[11] *See* Metropolitan Transportation Authority, "Central Business District Tolling Program," *available at*: https://new.mta.info/project/CBDTP.

[12] *See* Metropolitan Transportation Authority, "A New Congestion Relief Zone for New York," *available at*: https://new.mta.info/document/131571.

7

Congestion Pricing is not enjoined and Plaintiffs ultimately prevail—or if any of the other pending actions challenging Congestion Pricing succeed—Defendants would somehow have to refund all of the charges imposed from January 5th to the date of final decision. Such a massive refund effort is simply not feasible, particularly because many of the Congestion Pricing charges will be imposed via mail,[13] and will be imposed upon out-of-state drivers.

This assumes Defendants even have the money to refund. The money raised by Congestion Pricing is intended to fund MTA capital improvements.[14] Once it is spent, it is unclear whether Defendants would still be able to refund every Congestion Pricing charge if Plaintiffs ultimately prevail. *Cf. Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (collecting cases and noting that unlikelihood of collecting from insolvent party can constitute "irreparable harm"). According to a recent report by the New York State Comptroller, projected budget gaps for the MTA "are $211 million in 2024 increasing to $623 million in 2027 and $652 million in 2028. Inclusive of more speculative risks identified by the MTA, operating budget gaps could reach as high as $1.5 billion in 2025, $2.3 billion in 2026, $2.8 billion in 2027 and $3 billion in 2028."[15]

Defendants will inevitably argue that Plaintiffs cannot assert "irreparable harm" on behalf of every Rockland commuter. But the County Executive and legislators themselves, as well as various Rockland municipal employees, are frequently required to enter the CBD, as set forth in the accompanying affidavit. Without an injunction, they will all have to pay Congestion Pricing.

---

[13] *See* Metropolitan Transportation Authority, "Congestion Relief Zone – Toll Information," *available at*: https://congestionreliefzone.mta.info/tolling.

[14] *See* Metropolitan Transportation Authority, "Congestion Pricing Makes For Better Transit," *available at*: https://new.mta.info/tolls/congestion-relief-zone/better-transit.

[15] Office of the Comptroller, "Financial Outlook for the Metropolitan Transportation Authority" (October 2024), *available at*: https://www.osc.ny.gov/files/reports/osdc/pdf/report-17-2025.pdf.

**II. Plaintiffs are likely to succeed on the merits.**

As set forth in Parts II.A–C, *infra*, Plaintiffs are likely to succeed on the merits of all three asserted causes of action.[16] But in lieu of demonstrating such a likelihood, they may also obtain a preliminary injunction by demonstrating "serious questions on the merits." *State Farm Mut. Auto. Ins. Co.*, 120 F.4th at 82. "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* at 82–83 (citations omitted).

The cost of not granting the requested injunction are clear. Hundreds of thousands of commuters **will** be charged an excessive amount every day to enter Manhattan's CBD—money that is unlikely to be refunded if Congestion Pricing is ultimately struck down. In contrast, the benefit of allowing Congestion Pricing to move forward is largely hypothetical. Traffic and pollution **may** decrease in the CBD—and may correspondingly increase elsewhere. Defendants will see increased revenue—which **may** be enough to fund certain, as-yet-undisclosed capital projects, none of which are likely to benefit Plaintiffs.

**A. There is no rational relationship between Congestion Pricing and Defendants' objectives.**

Plaintiffs' First Cause of Action is brought pursuant to the Equal Protection Clause of the United States Constitution and the New York State Constitution. (*See* Am. Compl. ¶¶ 45–57.) Notably, "the New York State Constitution's … equal protection provision[] [is] at least as protective as [its] federal counterpart[]." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018).

---

[16] A fourth cause of action seeks an injunction "to study a possible offset for bridge tolls paid by Rockland residents for entry into New York County." (*See generally* Am. Compl. ¶¶ 58-62.)

To prevail on an Equal Protection claim where no suspect class or fundamental right is implicated, a plaintiff must show that the challenged law or rule bears no rational relationship to a legitimate government objective. "Put another way, we must ask whether there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Winston v. City of Syracuse*, 887 F.3d 553, 562 (2d Cir. 2018) (citation and internal quotation marks omitted). "[W]hile rational basis review is indulgent and respectful, it is not meant to be 'toothless.'" *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (citations omitted), *aff'd*, 570 U.S. 744 (2013). Similarly, while rational basis review is "highly deferential," it does "require some scrutiny of state and local government activity." *Winston*, 887 F.3d at 560.

Plaintiffs will concede, for purposes of this motion, that Defendants' objectives (raising revenue for the MTA's capital projects and reducing traffic and pollution in Manhattan's CBD) are legitimate.[17] The question thus becomes whether there is a "rational relationship" between these objectives and Congestion Pricing. *See id.* at 562. As noted, the current Congestion Pricing program, *inter alia*: 1) charges vehicles only upon entry to the CBD; 2) lacks a Hudson River bridge credit but gives credits to drivers using the lower Manhattan tunnels; 3) does not distinguish between electric and gas vehicles; and 4) grants certain income-based state tax credits to residents of the CBD ***only***.

On the limited record available, a rational relationship between the Congestion Pricing program and its objectives is clearly lacking. Regarding revenue, there is no support for the apparent suggestion that a $9 base charge is sufficient to fund the MTA's capital projects, when the original, "pre-pause" plan called for a base charge of $15. Conversely, if $9 is sufficient, why

---

[17] That said, there are other important objectives Defendants should consider. *See, e.g.*, *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 338 (S.D.N.Y. 2013) (referencing TBTA's "desire to reduce the burden suffered by geographically isolated New York residents, who have little or no practical access to mass transit").

does the MTA intend to raise the amount to $12 in 2028 and $15 in 2031, as widely reported?[18] And even if a particular amount was rationally related to some MTA capital project, there would be little-to-no benefit from said capital project to any Rockland commuter.

As for reduction of congestion, a rational program would link the toll to the amount of time a driver spends in Manhattan's CBD, and/or to the distance driven within the CBD. By instead charging drivers only upon *entry* to the CBD, the Congestion Pricing program does nothing to disincentivize the driver of a car *garaged* in the CBD from driving within the CBD as often as he or she may like. Moreover, the disincentivizing effect of Congestion Pricing vanishes if a commuter simply has no reasonable alternative to driving, as is the case for many Rockland commuters.

A rational program whose objective was to reduce pollution would distinguish between vehicles that emit exhaust and vehicles that do not. But the Congestion Pricing program charges the Rockland-based electric vehicle that enters Manhattan's CBD, while *not* charging the old gas guzzler that is constantly driven around the CBD and never leaves. Moreover, to the extent drivers are simply re-routed by the Congestion Pricing program, the *overall* amount of pollution is not decreased—the pollution is simply diverted to other locations.

**B.     Congestion Pricing is grossly disproportionate to the activity being deterred.**

The 8th Amendment to the United States Constitution and Article 1, Section 5 of the New York State Constitution both bar the imposition of "excessive fines." The analysis is identical:

> First, the court must determine whether the Excessive Fines Clause applies at all. That question turns on whether the fine may be characterized, at least in part, as punitive. Second, the court must determine whether the challenged forfeiture is unconstitutionally excessive. A fine is unconstitutionally excessive if it is grossly disproportional to the gravity of a defendant's offense.

---

[18] *See, e.g.*, Gothamist, "MTA Plans to Raise NYC's Congestion Pricing Toll to $15 in 2031" (Nov. 17, 2024), *available at*: https://gothamist.com/news/mta-plans-to-raise-nycs-congestion-pricing-toll-to-15-in-2031.

> …
> [T]o determine whether a fine is grossly disproportionate, the Court must consider: (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Morgulis v. Bus Patrol Am., LLC*, No. 24-cv-0113 (ER), 2024 WL 3639126, at *11 (S.D.N.Y. Aug. 1, 2024) (citations and internal quotation marks omitted).

A traditional toll is not "punitive"—it is consideration for the use of, *e.g.*, a bridge or tunnel. *See* Part II.C, *infra*. Congestion Pricing is different, because like a punishment, it is intended as a **deterrent**. (*See generally* Am. Compl. ¶¶ 63–70.) Indeed, Congestion Pricing can only achieve its stated goals of reducing traffic and pollution in Manhattan's CBD if it in fact deters drivers from entering the CBD.

Drivers who are not deterred—or drivers who simply have no other option—are charged $9 (soon to be $15) simply for entering the CBD. This is grossly disproportionate to "the nature of the harm caused by the … conduct," *Morgulis*, 2024 WL 3639126, at *11, given that the full amount is charged even if the driver spends a minimal amount of time, or drives a minimal distance, within the CBD. Indeed, the driver of an electric vehicle which emits **zero** pollution is nevertheless charged the full amount.

Even worse, under Congestion Pricing the full amount is charged regardless of whether a driver accidentally enters the CBD—which is virtually certain to occur, especially in the initial weeks following its implementation. A person's "intent and motive" are of course highly relevant to a "grossly disproportionate" Eighth Amendment analysis. *See Ramos v. Weber*, 303 F.3d 934, 937 (8th Cir. 2002); *see also Enmund v. Florida*, 458 U.S. 782 (1982) (striking down punishment on 8th Amendment grounds where there was no underlying intent to kill).

### C. Congestion Pricing is not a "toll," but rather a tax that Defendants are not authorized to impose.

The TBTA is generally authorized to set and collect tolls for the use of its facilities. *See* N.Y. PUB. AUTH. LAW § 553[12]. The MTA, similarly, may "set tolls and fares." *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 551 (S.D.N.Y. 2014). Neither, however, is statutorily authorized to impose a ***tax***, and Plaintiffs' Fourth Cause of Action alleges that by implementing Congestion Pricing, Defendants have done just that. (Am. Compl. ¶¶ 71–92.)

Importantly, a toll "refers to the consideration given for the use of roads, bridges, ferries, or similar things of a public nature." BLACK'S LAW DICTIONARY (3d ed. 1991); *see also Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 341 (S.D.N.Y. 2013) ("there must be a functional relationship between a fee or toll and those who pay it") (citations and internal quotation marks omitted). A tax, in contrast, is "money assessed on a person or property for the support of the government." *Id.* Congestion Pricing falls into the latter category. In contrast to, say, the George Washington Bridge, where a driver pays a flat amount in exchange for crossing the Bridge; or the New Jersey Turnpike, where a driver pays an increasing amount depending on how much of the Turnpike is traversed, Congestion Pricing is not consideration for a driver's "use" of Manhattan's CBD—if it were, it would be imposed on every driver "using" it. Indeed, Defendants do not even own, control or maintain the streets of lower Manhattan (that would be New York City's Department of Transportation), and thus cannot impose a toll for their use.

Moreover, bridge, tunnel and road tolls generally pay for the maintenance of said bridges, tunnels and roads. Congestion Pricing will not pay for the maintenance of Manhattan's CBD, however. It is intended to fund the MTA, LIRR, and Metro North. In other words, Congestion Pricing closely resembles money assessed for the general support of Defendants—both of which are governmental entities. *See Marett v. Metro. Transportation Auth.*, No. 19-cv-5144 (GBD),

2021 WL 961760, at *4 (S.D.N.Y. Mar. 15, 2021); *Atkinson v. B.C.C. Assocs., Inc.*, 829 F. Supp. 637, 649 (S.D.N.Y. 1993). This strongly suggests Congestion Pricing is an impermissible tax, masquerading as a toll.

Notably, this analysis dovetails not only with the 8th Amendment analysis (*see* Part II.B, *supra*), but also with constitutional claims brought by other plaintiffs seeking to halt Congestion Pricing. A toll "is permissible—and not a violation of either the right to travel or the dormant Commerce Clause—if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Angus Partners LLC. v. Walder*, 52 F. Supp. 3d 546, 560 (S.D.N.Y. 2014) (citations and internal quotation marks omitted). The $9 (soon to be $15) charge is not based on **any** "fair approximation of use" of the streets of lower Manhattan (which Defendants do not maintain), and it is clearly "excessive in relation to the benefits conferred" given that it confers no benefits at all upon most Rockland drivers. *See id.*

### III. The balance of equities weighs in favor of granting a preliminary injunction, which would also serve the public interest.

Finally, the Court must weigh the balance of the equities and determine whether the requested injunction is in the public interest. *See State Farm Mut. Auto. Ins. Co.*, 120 F.4th at 85; *Yang*, 960 F.3d at 135–36; *see also Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("The final two factors merge when an injunction is to be issued against the government.").

As noted, Governor Hochul recently "paused" implementation of Congestion Pricing for over six months. Nothing filed to the docket in this action indicates that either Defendant opposed this pause. Accordingly, they should be estopped from now arguing that they would somehow be prejudiced by another "pause," *i.e.*, by the requested preliminary injunction, which need last only

for so long as it takes to fully adjudicate this action.[19]

The effect upon Plaintiffs of *not* preliminarily enjoining this action would be severe. As noted, Rockland commuters already face some of the highest bridge tolls in the region. Nine more dollars per day, forty-five more dollars per week, and approximately two hundred more dollars per month is more than many can bear. *See Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 179 (S.D.N.Y. 2022) (finding that balance of equities and public interest both favored preliminary injunction and noting that "even a small price increase can make a significant difference").

Telling drivers to "switch to public transportation" might work in places where Manhattan's CBD is just a subway ride away. It is not so easy in a "transit desert" such as Rockland County,[20] where commuting to the CBD via public transportation can take hours. After all, "[p]ublic transit is only enticing to riders when it's a viable alternative to driving."[21] And it is not just Rockland County residents who oppose congestion pricing—a statewide poll conducted by Siena College last summer revealed that "59% of New York voters want to scrap the congestion pricing scheme for Manhattan entirely," including majorities of both major political parties.[22]

Notably, to the extent Congestion Pricing is unlawful under the federal or New York State constitutions, it weighs strongly in Plaintiffs' favor for purposes of a "public interest" analysis. *See Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 666 (S.D.N.Y. 2019) ("there is no

---

[19] It is again worth noting that a potentially preclusive decision may issue soon in the District of New Jersey. *See* FN2, *supra*.

[20] Floyd Lapp, "The MTA Needs Better Fiscal Management" (Nov. 27, 2024); *available at*: https://www.lohud.com/story/opinion/2024/11/27/mta-fiscal-management-congestion-pricing-letter/76600778007/.

[21] Mondaire Jones, "Rockland County Deserves a One-Seat Ride to NYC" (May 20, 2021); *available at*: https://www.lohud.com/story/opinion/2021/05/20/rockland-county-needs-direct-train-service-manhattan/5170113001/.

[22] Vaughn Golden, "More NYers Oppose Congestion Pricing" (Aug. 6, 2024); *available at*: https://nypost.com/2024/08/06/us-news/more-nyers-than-ever-oppose-congestion-pricing-siena-poll/.

public interest in allowing Defendants to proceed with an unlawful, arbitrary, and capricious rule that exceeds their statutory authority"), *aff'd as modified sub nom. New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020); *see also New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (no public interest "in the enforcement of an unconstitutional law") (citation omitted).

As a final note, there may well be more equitable ways to reduce Manhattan congestion and fund the MTA. With Defendants having not yet answered, it is unclear whether they have even explored such options, *i.e.*, a credit for Hudson River bridge crossings or expansion of light rail lines west of the Hudson. The public record is strikingly devoid of details as to how the most recent iteration of Congestion Pricing came to be, and the MTA has not identified any capital projects for Metro North at any of its Rockland County stations. The need to develop a "full record" weighs in favor of a preliminary injunction. *See Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 349 (S.D.N.Y. 2024).

## CONCLUSION

For the foregoing reasons, the undersigned respectfully submit that Plaintiffs' motion for a preliminary injunction should be granted.

Dated: White Plains, New York
December 6, 2024

BLEAKLEY PLATT & SCHMIDT, LLP
One North Lexington Avenue
White Plains, NY 10601
(914) 949-2700
*Co-Counsel for Plaintiffs*

by: /s/ *David H. Chen*
David H. Chen, Esq.
dchen@bpslaw.com

Matthew G. Parisi, Esq.
mparisi@bpslaw.com